Filed 1/5/15  Ruebe v. Parsa CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| BAMBI RUEBE,<br><br>  Plaintiff, Cross-defendant and Respondent,<br><br>v.<br><br>DAYRUSH J. PARSA et al.,<br><br>  Defendants, Cross-complainants and Appellants,<br><br>HAMID LASHKARI,<br><br>  Defendant and Appellant. | 2d Civil No. B251016<br>(Super. Ct. No. 56-2011-00404786-CU-OR-VTA)<br>(Ventura County) |

A California poet famously questioned whether good fences make good neighbors.[1]  In this case, they did not.

Appellants Dayrush and Kathleen Parsa and respondent Bambi Ruebe own neighboring properties.  Ruebe has a backyard but no driveway or back door to access it.  So she built a gate in the fence enclosing her backyard that opens onto the Parsas'

---

[1] (Frost (1914) Mending Wall in North of Boston, pp. 11-13 ["'*Why* do they make good neighbours? . . . Before I built a wall I'd ask to know / What I was walling in or walling out, / And to whom I was like to give offence . . .'"].)  Although Robert Frost's poetry is "intimately associated with rural New England, one tends to forget that the first landscape printed on his imagination was both urban and Californian," Frost having lived in San Francisco until the age of 11.  (Parini, Robert Frost:  A Life (1999) p. 3.)

driveway. She accessed her backyard through the gate by traveling over the Parsas' driveway to and from the public street. Disturbed by this intrusion onto their property, the Parsas built their own fence surrounding the gate, preventing Ruebe from using it.

Ruebe sued, claiming that she had a prescriptive easement to use the Parsas' driveway with which appellants unlawfully interfered. The jury agreed with her and awarded compensatory and punitive damages against Parsa and punitive damages against appellant Hamid Lashkari, the Parsas' property manager.[2] In addition, the trial court ordered the Parsas to repave their driveway to remedy a continuing nuisance from water drainage onto Ruebe's property. The Parsas and Lashkari appeal, challenging the prescriptive easement finding, the injunction to repave their driveway, and the punitive damages award. We affirm.

## FACTS

### Ruebe's Evidence

The Parsas have owned the rental property located at 58 North Oak Street in Ventura since 1980. Lashkari and Buena Properties have been managing the property since 2002. The property includes a driveway leading to a parking lot, which the Parsas also own. The driveway is the only means of access to the parking lot. Parsa also owns a commercial building (Zander building) that connects to the parking lot.

Ruebe moved into the property next door at 50 North Oak Street in 1989 or 1990 when she was pregnant with her son, Lancelot, and the two of them have lived there since. The Parsas' driveway runs between the house they own and Ruebe's house. At the time Ruebe purchased her house, she understood from disclosures in the purchase agreement that there was a prescriptive easement allowing her access to her backyard area via the driveway.[3]

---

[2] Throughout this opinion, "Parsa" in the singular refers to Dayrush Parsa, "Parsas" in the plural refers to Dayrush and Kathleen Parsa, and "appellants" refers to the Parsas and Lashkari.

[3] This was only her understanding. Nothing in the record suggests that a prescriptive easement was ever recorded.

2

At the time Ruebe moved in, her backyard area was unenclosed. She installed a white picket fence in approximately 1993. The fence contained an eight- to ten-foot-wide gate that allowed her to enter and exit the backyard. The gate appeared different from the surrounding fence in that it had a scallop-shaped top, big black hinges, and a handle with a lock. The pavement led up to and through the gate. There were two large potted plants on either side. Throughout the 1990s and early 2000s, Parsa would visit the parking lot each week.

Ruebe used the gate "multiple times a day on most days," occasionally in one of her vehicles, depending on her needs. She would bring cars into the backyard to perform maintenance on them. She frequently parked one of her cars there for security reasons. Ruebe used the driveway for walking and driving access to her backyard, taking out the trash, bringing in groceries, running her business, maintaining plants along the driveway and the back end of her property, and maintaining the property itself. She believed she had a right to use the gate and always did so openly. Except for when the Parsas repaved the driveway and the parking lot, Ruebe used the driveway continuously until the Parsas blocked the gate leading to her backyard.

The Parsas have never given Ruebe permission to use their driveway. Since the 1990s, Ruebe and the Parsas have been in a dispute over Ruebe's use of it. Parsa frequently complained about Ruebe parking her vehicles in the parking lot. Their dispute led to litigation in the 1990s. In 1995, Parsa wrote a letter to Ruebe's attorney stating that she was not allowed to use his parking spaces and could use the driveway only if she had a grant deed permitting her to do so.

At some point in the 1990s, Parsa asked Ruebe to move her vehicle out of the parking lot, and she told him that she would put the vehicle in her backyard. She parked her car in the backyard whenever the Parsas asked, such as when they repaved the parking lot. Although Ruebe never saw Parsa when she had the gate open, she left it open for periods of time. From 1995 onward, appellants were aware that Ruebe was using the driveway and that she claimed she had a right to do so, but they ignored it. Appellants did "not pretend it [was] okay" for Ruebe to use the parking lot.

In approximately 2009, Ruebe spent three months remodeling the fence and replacing the gate with restored wood, handcrafted metalwork, and antique lanterns. The new gate was approximately the same size and in the same location as the previous gate. Although there are fast-growing bushes in front of the gate, they did not impede Ruebe's ability to enter and exit her backyard.

After Ruebe completed the gate, appellants sent her a letter demanding that she remove it within 10 days or they would install a fence. Lashkari told her that if she did not pay him $100 per month, he would build a wall in front of her gate. She refused, and appellants began constructing a wooden fence around the gate. Ruebe told appellants that the gate was how she had always accessed her backyard. Because no one warned Ruebe that construction was about to commence, she did not have an opportunity beforehand to remove her car from the backyard where it was parked. Her car became trapped inside. In deposition testimony read to the jury, Parsa stated, "[Ruebe] felt she had a right to build a fence and we had a right to build a fence. We countered her fence."

When the Parsas' fence was completed in December 2010 or January 2011, it prevented Ruebe from opening her gate more than a few feet and completely blocked all vehicular access to her backyard. The only way to reach the backyard was by crawling through a window at the rear of the house over her sink counter or by shimmying around a one-foot gap between the Parsas' fence and Ruebe's gate.[4]

The Parsas repaved their driveway in October 2008. Prior to that time, the driveway had a channel running down the middle. The channel would cause groundwater to be diverted away from the properties on either side as it flowed out to the street. The new driveway slopes towards Ruebe's house and causes water to flow into the side of it. Because that side of Ruebe's house was subterranean, with the floor level about four feet below the driveway, the water would flow in from the new driveway, cascade down, and fill up the area outside her bedroom window. When it rained hard, the water would run

---

[4] A side gate along the driveway leads to a small, confined area on the side of Ruebe's home with a four-foot drop off. There is no connectivity between this area and the rest of the backyard, however, due to an impassable shed.

4

over the foundation curb on Ruebe's side of the driveway and travel along the brick wall of her house, which did not have a waterproof barrier. It never did this before the driveway was repaved. After the Parsas built the fence blocking Ruebe's gate, the foundation supporting the fence mitigated the water flow onto Ruebe's property to some extent.

Dana Steele, Ruebe's expert on driveway construction, testified that when pouring concrete for sidewalks and driveways, care must be taken to ensure appropriate water drainage. A grade is necessary to divert water away from structures and into the street or culverts. Keeping water away from building foundations is important to prevent damage from erosion, settling, and in some cases depending on the elevation, dry rot and mold. Steele opined that the new driveway was excavated incorrectly and, contrary to industry standards, did not have a channel to divert water away from Ruebe's house. Based on the relatively large size of the parking lot from which water would drain, he expected that the driveway's diversion of water towards Ruebe's house would cause "major problems." Any "real rain" would cause "a significant amount of water" to flow into Ruebe's backyard. Steele testified that repaving the driveway to provide proper drainage would cost $15,400.

*Appellants' Evidence*

Appellants impeached Ruebe with her deposition testimony that she parked her cars in the backyard only "rarely." She parked her cars in the parking lot "most of the time" and, when the two spaces nearest her backyard were unavailable, either in the backyard or on the street. Parsa testified that he never paid attention to Ruebe's original gate and never saw her car parked in the backyard. He did not think she used the gate because of the weeds growing in front of it. He assumed Ruebe had a back door through which she could access the backyard. Although he did not expressly give her permission to use the driveway, it was open to the public. Parsa believed he impliedly gave Ruebe permission to use the driveway by ignoring her use of it.

According to Parsa, Ruebe had paid for a parking space for a month or two in 1993. Prior to constructing the blocking fence, appellants offered to let Ruebe use two

5

parking spaces for $100 per month, which would have included access to her gate, but Ruebe refused to pay. Parsa built the blocking fence mainly because he did not believe that Ruebe had an easement. He also was concerned about liability for injuries. Someone had told him that there was a drop inside the backyard and he worried that if the gate were left open, someone could fall and get hurt.

Lashkari claimed that he gave Ruebe an opportunity to move her car on the morning that they began installing the blocking fence, but she refused to do so.

The contractor who repaved the Parsas' driveway testified that he did not notice a swale in the middle of the driveway and could not have created one because the driveway was too narrow.

Lashkari's net worth was approximately $500,000. Parsa's net worth was approximately $5 million.

PROCEDURAL HISTORY

Ruebe sued appellants, Buena Properties, and a Buena Properties employee. Ruebe alleged that she had a prescriptive easement to pass through and across the Parsas' driveway and, next to her property in the parking lot, to store trash cans and use two parking spaces.[5] Her claims centered on appellants' alleged interference with the easement and the damage to her property from the repaved driveway. In Ruebe's first amended complaint, she alleged causes of action for declaratory relief, trespass, nuisance, negligence per se, extortion, quiet title to easement, and injunctive relief. In addition to the equitable relief, she sought compensatory and punitive damages. The Parsas filed a cross-complaint against Ruebe for declaratory and injunctive relief.

Appellants demurred to Ruebe's first amended complaint and moved to strike Ruebe's allegations regarding punitive damages, attorney fees, and statutory double and treble damages. The trial court sustained the demurrer without leave to amend as to Ruebe's cause of action for extortion and overruled it in all other respects. The court

---

[5] The first amended complaint refers to trash can storage and parking space use "adjacent to Plaintiff's western property boundary line." Presumably, Ruebe meant the *eastern* property boundary line. To the west, her property fronts North Oak Street.

6

granted the motion to strike except as to Ruebe's allegations concerning punitive damages. The court found that since Ruebe's claims for punitive damages were "all based on the allegations of extortion," the issue was moot in light of the ruling on the demurrer. Notwithstanding the trial court's ruling on the motion to strike, it allowed Ruebe's demand for punitive damages to be determined by the jury.

The proceedings were bifurcated into a jury trial on the legal issues followed by a court trial on the equitable issues. By stipulation, the jury trial was subdivided into two phases. The testimony regarding appellants' net worth was presented in the second phase, after liability had been established.

The jury returned special verdicts in favor of Ruebe in all respects. Specifically, it found that (1) Ruebe had established a prescriptive easement for vehicles and pedestrians to travel over the driveway to and from her backyard and for "[p]edestrian ingress and egress around [the] perimeter of [her] fence and gate for maintenance"; (2) both the repaved driveway and the blocking fence were nuisances for which Parsa was liable; and (3) Parsa and Lashkari acted with malice, oppression, or fraud. The jury awarded Ruebe $10,000 in noneconomic damages against Parsa for pain and suffering. The jury awarded her punitive damages of $30,000 against Parsa and $4,500 against Lashkari.

After discharging the jury, the trial court heard argument from counsel on Ruebe's claims for equitable relief and on appellants' cross-complaint for declarative and injunctive relief as to Ruebe's use of their parking spaces. Subsequently, the court issued a tentative statement of decision requiring appellants to remove the blocking fence and driveway paving, obtain an engineering study evaluating water flow through the driveway and the proper pitch, trenching, and materials for a paved surface through the driveway, and repave the driveway using a licensed contractor in compliance with the engineering study and any building code requirements. The court found that Ruebe had not established a prescriptive easement to use or adverse possession of the parking spaces. It ordered her to remove her property from the parking spaces and to cease and desist from using them.

7

The trial court entered a "Judgment on Special Verdicts," which restated the findings from the jury's special verdicts but did not address equitable relief. Subsequently, appellants moved for partial judgment notwithstanding the verdict, asking the court to set aside the punitive damages award. In addition, appellants moved for a new trial. While those motions were pending, the court entered a "Judgment After Court Trial" setting forth its equitable relief. The court then denied both pending post-trial motions. Appellants filed a timely notice of appeal.

## DISCUSSION

Appellants challenge the prescriptive easement finding, the injunction requiring the Parsas to repave their driveway, and the punitive damages award.

### *Appellate Jurisdiction*

Initially, we must determine the scope of the appeal. Ruebe contends that appellants have forfeited review of the trial court's equitable judgment by failing to designate it in their notice of appeal. As appellants point out, "'. . . notices of appeal are to be liberally construed so as to protect the right of appeal if it is reasonably clear what [the] appellant was trying to appeal from, and where the respondent could not possibly have been misled or prejudiced.'" (*In re Joshua S.* (2007) 41 Cal.4th 261, 272.) Nonetheless, "'"[w]here several judgments and/or orders occurring close in time are separately appealable . . . , each appealable judgment and order must be expressly specified—in either a single notice of appeal or multiple notices of appeal—in order to be reviewable on appeal."'" (*Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1316.)

Here, the trial court issued two separate judgments. In the notice of appeal, appellants specified that they were appealing only the first of these. They selected the box on the form indicating that they are appealing a "[j]udgment after jury trial" and stated that it was entered on June 18, 2013, the date that the court entered its "Judgment on Special Verdicts." Appellants left unselected the box for "[j]udgment after court trial." Appellants thus failed to expressly appeal the judgment affording equitable relief.

8

The foregoing analysis presupposes, and the parties agree, that the trial court's two judgments were separately appealable. In fact, they were not. Appellants violated the one final judgment rule, which "precludes an appeal from a judgment disposing of fewer than all the causes of action extant between the parties, even if the remaining causes of action have been severed for trial from those decided by the judgment."[6] (*Kurwa v. Kislinger* (2013) 57 Cal.4th 1097, 1101.) The "Judgment on Special Verdicts" was not a final judgment because it did not dispose of the claims for declaratory and injunctive relief made by Ruebe in her first amended complaint and by appellants in their cross-complaint. In other words, appellants have attempted to appeal a nonappealable interlocutory judgment. (*See Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 741.)

"[A] notice of appeal that specifies a nonappealable order or other interlocutory determination may be construed to refer to an existing appealable judgment or order that could and should have been specified." (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 564, p. 643; see also *Walker v. Los Angeles County Metropolitan Transp. Authority* (2005) 35 Cal.4th 15.) And although an appeal from a specific portion of a judgment ordinarily would leave the parts not appealed from unaffected and therefore final, "an exception is made in cases involving judgments whose parts are not deemed to be severable. In such cases an appeal from a portion of the judgment brings up for review not only the portion appealed from but those other portions which are found to be 'interdependent upon' it." (*Gonzales v. R. J. Novick Constr. Co.* (1978) 20 Cal.3d 798, 805.)

The equitable relief granted in the trial court's "Judgment After Court Trial" was dependent upon the jury's factual findings memorialized in the first judgment. Any change rendered in the first judgment would necessarily affect the validity of the second. Accordingly, we construe the notice of appeal to encompass the entire judgment, including both the legal and equitable relief.

---

[6] Of course, the trial court should not have entered two separate judgments. (Cal. Rules of Court, rule 3.1591(a).)

## *Prescriptive Easement*

"A prescriptive easement in property may be acquired by open, notorious, continuous, adverse use, under claim of right, for a period of five years. (Code Civ. Proc., § 321; Civ. Code, § 1007.) Although the [jury]'s finding of the existence of a prescriptive easement must be based upon clear and convincing evidence, if there is substantial evidence to support its conclusion, the determination is not open to review on appeal. [Citation.] The usual rule of conflicting evidence is applied, giving full effect to respondent['s] evidence, however slight, and disregarding appellant[s'] evidence, however strong. [Citations.]" (*Applegate v. Ota* (1983) 146 Cal.App.3d 702, 708.) The trial court's rulings on the admissibility of evidence are reviewed for abuse of discretion. (*San Diego Gas & Electric Company v. Schmidt* (2014) 228 Cal.App.4th 1280, 1301.)

Appellants contend that the trial court erred by allowing testimony that Ruebe often used the driveway to park in the Parsas' parking lot when her sole reason for seeking an easement over the driveway was to access her backyard. According to appellants, "it was undisputed, and ordered by the court in its statement of decision, that Ruebe was not entitled to have an exclusive permissive [*sic*] easement of the Parsas' driveway for purposes of parking in their parking spaces." Therefore, they argue, evidence of Ruebe's parking in their lot was irrelevant and confused the jury. We disagree.

"'The scope of a prescriptive easement is determined by the use through which it is acquired. A person using the land of another for the prescriptive period may acquire the right to continue such use, but does not acquire the right to make other uses of it. [Citations.]' [Citation.]" (*Connolly v. McDermott* (1984) 162 Cal.App.3d 973, 977, fn. omitted.) "The ultimate criterion in determining the scope of a prescriptive easement is that of avoiding increased burdens upon the servient tenement [citation] while allowing some flexibility in the use of the dominant tenement [citation]." (*Pipkin v. Der Torosian* (1973) 35 Cal.App.3d 722, 729.)

Ruebe sought an easement for pedestrian and vehicular traffic over appellants' driveway. Whether heading to her backyard or to the adjacent parking spaces,

10

Ruebe and her guests entered from Oak Street, traversed the driveway, and turned right. What they did afterwards does not affect the scope of the easement, which "should be defined in terms of the right to pass and repass over the [driveway] by foot [or] by automobile . . . , provided that the nature, scope and extent of the use does not substantially increase the burden placed upon the servient tenement as it existed during the period that the prescriptive easement was acquired." (*Pipkin v. Der Torosian*, *supra*, 35 Cal.App.3d at p. 729 [concluding that the trial court "erred in defining the prescriptive easement exclusively in terms of the use to which the dominant estate was put during the prescriptive period"].)  The testimony regarding Ruebe's use of the driveway to park in the parking lot was properly admitted to show the scope of her easement.

Appellants assert that "there was a dearth of evidence that Ruebe established a prescriptive easement for purposes of parking in her own backyard."  In light of the abundant evidence that Ruebe frequently used the driveway to park in appellants' parking lot, it makes no difference whether there was any evidence that she also used it to enter her backyard.  And, in fact, there *was* substantial evidence of that.

Charlyn Manning, who worked for Parsa showing properties and collecting rent from 1996 or 1997 to 1999, observed Ruebe go in and out of her backyard many times, sometimes in a vehicle.  Manning's daughter, Candie Lange, who cleaned floors in the Zander building and rented from Parsa for 12 years, saw Ruebe drive along the driveway and park in both her backyard and the parking lot.  This occurred "regularly"— at least once per month—from 1996 to 2006.  Ruebe's longtime friend Ron McMurray reported that she "quite frequently" parked her cars in her backyard for security reasons. Ruebe testified that she used the gate to access the backyard "multiple times a day on most days," occasionally in one of her vehicles, depending on her needs.  Substantial evidence supports the jury's finding that Ruebe continuously used the driveway to park in her backyard. (See *Fogerty v. State of California* (1986) 187 Cal.App.3d 224, 239 ["'If a right of way over another's land has been used for more than five years, it is not necessary, to make good such use, that the claimant has used it every day.  He uses it every day, or once in every week, or twice a month, as his needs require.  He is not

11

required to go over it when he does not need it, to make his use of the way continuous . . .'  [Citation.]"].)

Appellants next contend that the trial court erroneously admitted hearsay testimony showing that the easement was used without interruption for 90 years.  Ruebe testified about conversations she had had with prior owners of her house and the original owner's business manager regarding the easement's existence.  Over appellants' objections, the court allowed this testimony as an exception to the hearsay rule under sections 1321 and 1322 of the Evidence Code.[7]

This testimony was admissible for a non-hearsay purpose.  It provided a foundation for Ruebe's belief that she had a lawful easement to use the driveway, which in turn was probative of the fact that she was using the easement openly and notoriously.  Whether the out of court statements were true—i.e., whether she actually had a lawful easement through former owners' use—did not matter in that regard.  The trial court did not abuse its discretion in admitting them.  Moreover, any error was harmless.  There was overwhelming evidence that, to the extent the easement did not exist at the time Ruebe purchased her property, she prescriptively acquired it afterwards.

Appellants also challenge the special verdict forms.  They contend the two separate verdicts for nuisance confused the jury because the trial court did not explain the specific conduct to which each form applied and gave two separate nuisance instructions.  But it was *appellants* who suggested giving two separate instructions on nuisance.  The trial court informed the jury that "[o]ne of them goes to the prescriptive easement to travel across the Parsas' property, and the other goes to the driveway and the repaving of it."  Ruebe's counsel led the jury through both the nuisance and the nuisance by driveway special verdict forms question by question, discussing the evidence that supported each claim.  There was no reasonable likelihood of jury confusion that the nuisance form

---

[7] These sections provide that "[e]vidence of reputation in a community is not made inadmissible by the hearsay rule if the reputation concerns the interest of the public in property in the community and the reputation arose before controversy" (Evid. Code, § 1321), and "[e]vidence of reputation in a community is not made inadmissible by the hearsay rule if the reputation concerns boundaries of, or customs affecting, land in the community and the reputation arose before controversy" (*id.* at § 1322).

12

related to the blocking fence and the nuisance by driveway form related to the water damage caused by the repaved driveway.

In addition, appellants claim that the scope of the easement sought by Ruebe was constantly changing. It was, but only because appellants themselves succeeded in narrowing it to remove the use of their parking spaces from consideration. Contrary to appellants' representations, Ruebe did not stipulate and the trial court did not rule to exclude pedestrian ingress and egress from the easement's potential scope.

*Order to Repave the Parsas' Driveway*

Appellants challenge the trial court's order to repave their driveway a second time on the ground that there is insufficient evidence that the original repaving damaged Ruebe. However, "an affected party need not wait until actual injury occurs before bringing an action to enjoin a nuisance." (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1213, fn. omitted.) Of course, "where, as here, the demand for injunctive relief is based upon the potential or possibility of future injury then at least some showing of the likelihood and magnitude of such an event must be made. 'A mere possibility or fear of future injury from a structure, instrumentality, or business which is not a nuisance per se is not ground for injunction, and equity will not interfere where the apprehended injury is doubtful or speculative; reasonable probability, or even reasonable certainty, of injury, or a showing that there will necessarily be a nuisance, is required.' [Citation.]" (*Id.* at p. 1213; see also *Helix Land Co. v. City of San Diego* (1978) 82 Cal.App.3d 932, 950-951 ["[A] prospective nuisance may be enjoined, yet facts must be alleged to show the danger is probable and imminent"].)

The evidence at trial leaves little doubt that Ruebe will suffer injury if the nuisance of water runoff from the repaved driveway is left unabated. Before the repaving, water drained from the parking lot to the street through a channel in the middle of the driveway without spilling over into Ruebe's property. Afterwards, even light rain causes the water to flow along and into her property, flooding the subterranean areas. Ruebe's expert opined that, based on his experience repairing building foundations from

13

improper drainage, it was "[d]efinitely" more likely than not that the flooding around Ruebe's foundation would result in damage from erosion, settling, dry rot, or mold. Substantial evidence supports the trial court's equitable relief.

<em>Punitive Damages</em>

Appellants challenge the award of punitive damages on several grounds. First, they contend that the jury should not have been allowed to consider the issue because the trial court had sustained their demurrer to Ruebe's cause of action for extortion and, believing that to be her sole basis for punitive damages, denied as moot their motion to strike the punitive damages demand. We disagree.

There was no variance between pleading and proof. Although the trial court evidently assumed that Ruebe had no remaining claims in the first amended complaint for which she was seeking punitive damages, that was not in fact the case. In her third cause of action for nuisance, Ruebe alleged that appellants "acted with oppression, fraud, and malice" in building the blocking fence. In the prayer for relief on this cause of action, she stated that she was seeking punitive damages. The Parsas should have recognized that their motion to strike was not moot and sought a ruling on its merits.

Moreover, at every subsequent stage of the proceedings, appellants were on notice that Ruebe was seeking punitive damages. In her trial brief, Ruebe stated that she intended to seek punitive damages on a theory of malice that appellants intentionally interfered with her property by building the blocking fence. (See *Stokes v. Henson* (1990) 217 Cal.App.3d 187, 196 ["[T]he [unpled] issue was clearly raised by the plaintiffs' trial brief, to which [the defendant] made no objection"].) During trial, appellants never objected to testimony relating to malice, such as questions posed to Parsa about his motive for constructing the blocking fence. (See *Frank Pisano & Associates v. Taggart* (1972) 29 Cal.App.3d 1, 16 [failure to object to introduction of evidence inconsistent with pleading deemed waiver].) Appellants merely argued in their motion for nonsuit and directed verdict that the evidence presented at trial did not support a malice finding—an issue to which we shall turn shortly.

14

Ruebe's operative pleading demanded punitive damages, and appellants were fully aware that the trial court planned to allow trial on that issue. There was no prejudice to them from the trial court's comment early in the proceedings that the issue was moot.

Second, appellants argue that there was insufficient evidence of malice to support the award of punitive damages. "[W]e review an award of punitive damages under the substantial evidence test. [Citations.] We consider the evidence in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference, and resolve evidentiary conflicts in support of the judgment. [Citation.]" (*Powerhouse Motorsports Group, Inc. v. Yamaha Motor Corporation* (2013) 221 Cal.App.4th 867, 885.)

Appellants maintain that they cannot be liable for punitive damages as a matter of law where they were simply trying to protect their property rights from a perceived attempt by Ruebe to obtain a prescriptive easement and the validity of her easement was unknown and disputed. This court has held otherwise. (*Zimmer v. Dykstra* (1974) 39 Cal.App.3d 422, 438-439 [upholding punitive damages award where "substantial evidence . . . support[ed] the trial court's finding of oppression and malice" notwithstanding that it was "inconsistent with defendant's testimony that she believed that she had the right to fence the area in dispute"].)

Appellants would distinguish *Zimmer* on the ground that the substantive elements of punitive damages have changed since it was decided. We disagree. As appellants concede, since 1872 punitive damages have been authorized in an action "for the breach of an obligation not arising from contract," where "the defendant has been guilty of oppression, fraud, or malice . . . for the sake of example and by way of punishing the defendant." (Civ. Code, § 3294, subd. (a).) The 1980 revisions to the statute did not make malice more difficult to prove. Rather, they replaced the reference to "express or implied" malice with a more detailed definition of malice: "conduct which is intended by the defendant to cause injury to the plaintiff or conduct which is carried on by the defendant with a conscious disregard of the rights or safety of others." (Former

15

Civ. Code, § 3294, subd. (c)(1).) Although the 1987 statutory amendments changed the standard of proof from a preponderance of the evidence to clear and convincing evidence, this changed the quantum of evidence necessary to prove malice, not the scope of its definition.

The 1987 revisions did narrow the scope of malicious conduct somewhat by adding to the definition of malice the requirements that the conduct, if not intentionally injurious, be "despicable" and carried on with a "willful" and conscious disregard for others' rights or safety. However, the term "despicable" applies to the nature of the act rather than to the defendant's state of knowledge about the plaintiff's rights. Although the term "willful" suggests that the defendant must disregard the plaintiff's rights intentionally, it is the term "conscious" that is at issue here—whether appellants *knew* that they were disregarding Ruebe's rights. This formulation has been in place since well before the 1980 statutory changes. (See, e.g., *Silberg v. California Life Ins. Co.* (1974) 11 Cal.3d 452, 462 [to be liable for punitive damages, defendant "must act with the intent to vex, injure or annoy, or with a conscious disregard of the plaintiff's rights"].)

Appellants also attempt to distinguish *Zimmer* factually. They assert that unlike the clear-cut evidence of an easement in *Zimmer*, the evidence here shows that Parsa was genuinely unaware that Ruebe had acquired an easement. Again, we disagree. Parsa's claim of ignorance rested largely on his insistence that he did not notice the original gate that Ruebe built. Ruebe contested Parsa's story, arguing that he was lying when he claimed never to have noticed it because, by his own admission, he had passed by the fence at least 500 times and had even taken pictures of it in which the gate was clearly visible. Moreover, Parsa's own employee, Manning, was aware that Ruebe was driving in and out of the gate during the prescriptive period.

In addition, Parsa's testimony on why he constructed the gate was evasive and inconsistent. He testified in deposition that he did not know why he constructed the blocking fence but thought it was "decorative." He stated that he "didn't want to look at [Ruebe's] side of the fence. It was not very appealing." At trial, Parsa tried to minimize

16

this testimony, saying that the attractiveness of Ruebe's fence was a "minor issue." Ultimately, he conceded that her fence *was* appealing. The jury may have disbelieved his self-serving statement that he built it because he "did not believe she had an easement" and instead concluded that he built it in retaliation when Ruebe refused to pay him $100 a month to use the parking spots. Given how useless the fence was to Parsa and how vexing it was to Ruebe, substantial evidence supports the jury's finding that Parsa's conduct was malicious.

Third, appellants contend that the trial court erred by admitting evidence of conditions on other properties owned by Parsa. This evidence was relevant because one of Parsa's stated reasons for building the blocking fence was to improve the aesthetic value of his property. Testimony that he never made similar improvements to his other properties served to impeach him. The trial court did not abuse its discretion.

Finally, Lashkari argues that the punitive damages award was improper as to him because the jury did not award either compensatory or nominal damages against him. It is well established that "'[a]ctual damages must be found as a predicate for exemplary damages. . . .'" (*Mother Cobb's Chicken Turnovers v. Fox* (1937) 10 Cal.2d 203, 205.) Under California's bright line rule, a dollar can make a world of difference. An award of just $1 in actual damages will support an award of $550,000 in punitive damages (*Werschkull v. United California Bank* (1978) 85 Cal.App.3d 981), whereas a jury's express finding that the plaintiff is entitled to "0.00" in compensatory damages requires reversal of a $92,000 punitive award (*Cheung v. Daley* (1995) 35 Cal.App.4th 1673).

Though the line is bright, it is not inflexible. Punitive damages may be imposed even without compensatory damages if accompanied by their equivalent, such as restitution, an offset, damages conclusively presumed by law, or nominal damages. (*Berkley v. Dowds* (2007) 152 Cal.App.4th 518, 530.) Here we consider whether damages against Lashkari can be conclusively presumed as a matter of law. The problem

lies in ascertaining whom the jury found to have caused Ruebe's actual damages.  The source of the difficulty is the special verdict form awarding compensatory damages.  It did not specify whether the damages were attributable to and therefore awarded against Parsa alone or against both Parsa and Lashkari in some combination.

The special verdict form posed a series of questions about whether Parsa harmed Ruebe by building the blocking fence, which the jury answered in the affirmative.  In that context, the final question—"What are [Ruebe's] damages?"—strongly implied that it concerned damages attributable to Parsa.  However, the jury was instructed that this claim was made against all defendants.  The jury was further instructed that Lashkari was Buena Properties' employee, Buena Properties was Parsa's agent, and Parsa was responsible for any harm caused by Lashkari's conduct.  Therefore, it is impossible to know from the special verdict form alone whether the jury found that the damages were solely attributable to Parsa or jointly and severally to Lashkari and Parsa.

Nonetheless, we can determine the jury's intent from the jury instructions and special verdict relating to punitive damages.  (See *Clark v. McClurg* (1932) 215 Cal. 279, 284 ["We must assume that the jury gave heed to these instructions"].)  The jury was instructed that it must decide whether Parsa acted with malice, oppression, or fraud if it found that his conduct caused Ruebe harm.  Similarly, the jury was instructed that if Lashkari's and Buena Properties' conduct caused Ruebe harm, it must decide whether they acted with malice, oppression, or fraud.  Since the jury found that Parsa and Lashkari each acted with malice, oppression, or fraud on the special verdict form, the logical inference is that the jury found that both Lashkari and Parsa inflicted the harm on Ruebe.  (See *ibid.*)  Therefore, we conclude that the jury awarded actual damages against

18

Parsa and Lashkari jointly and severally and that the punitive damages against Lashkari were appropriate.

DISPOSITION

The judgment is affirmed. Costs to respondent.

<u>NOT TO BE PUBLISHED.</u>


PERREN, J.


We concur:



GILBERT, P. J.



YEGAN, J.

19

Rebecca Riley, Judge

Superior Court County of Ventura

---

Masserman & Ducey, Mitchell F. Ducey; Stub, Boeddinghaus & Velasco and David N. Tedesco for Appellants.

Law Offices of Ball and Yorke and Esther R. Sorkin for Respondent.